UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM RANDEL WILBOURN-LITTLE,

      Petitioner,                              Case No. 2:23-CV-11394

v.                              UNITED STATES DISTRICT COURT JUDGE
                                      GERSHWIN A. DRAIN

BRYAN MORRISON,

      Respondent,
_____/

**OPINION AND ORDER DENYING: (1) PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS* [ECF No. 1]**

## I.      INTRODUCTION

William Randel Wilbourn-Little, ("Petitioner"), confined at the Muskegon Correctional Facility in Muskegon, Michigan, filed a *pro se* petition for writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254. He challenges his conviction for three counts of first-degree murder, Mich. Comp. Laws § 750.316(1)(a), one count of felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and four counts of possession of a firearm in the commission of a felony (felony-firearm), Mich. Comp. Laws § 750.227b. For the reasons set forth below, the petition for writ of habeas corpus is **DENIED**.

## I.      BACKGROUND

Petitioner was convicted following a jury trial in the Wayne County Circuit Court. This Court recites *verbatim* the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009).

> This case arises from a shooting incident, which resulted in the death of three
> victims: Deshawn Gadson, Trevaughn Anthony, and Rashaun Harrington.

1

On September 8, 2018, at about 11:00 p.m., Maurice Jones, Micah Pittman, and the three victims went to a White Castle restaurant on Livernois Avenue in Detroit. The group drove to the White Castle in two separate vehicles: Gadson and Pittman in a car and Anthony, Harrington, and Jones in a pickup truck. When they arrived, a White Castle employee unlocked the doors and allowed the victims and Jones to go inside to order food while Pittman waited in the car. Shortly thereafter, Pittman saw Tamarrian Brassel, who was known to be friends with defendant, driving a black car around the outside of the White Castle. Pittman called Brassel on her cellphone, had a conversation for less than one minute, and then hung up and tried to sleep. Meanwhile, inside the White Castle, Jones stated the victims were talking about "ops riding past and cars riding back and forth[,]" meaning "opponents or people they don't like." Jones's food order was completed first, so he left the White Castle and went to his pickup truck while the victims waited inside. A few minutes later, Pittman saw two individuals, a taller person with a "high-powered" long gun and a shorter person with a handgun, at the side doors of the White Castle. Similarly, Jones saw three individuals, from his vehicle, which included a taller person with an "assault rifle" and a medium and short person each with handguns, outside the White Castle. Pittman and Jones testified that the shooters wore masks and the taller shooter wore a black shirt and pants. Jones and Pittman then heard multiple gunshots. When police arrived, Pittman identified defendant, Brassel, Farrad Anderson, and Courvoisier Jackson as being involved in the shooting from still photographs of video surveillance footage.

Video surveillance footage was recovered from several cameras around the White Castle building and a Valero gas station, about 60 yards from the White Castle. Michigan State Police Detective Mark Lambert reviewed the videos, revealing about two hours before the shooting, a blue Ford Taurus and black Toyota Camry pulled into the gas station. A few minutes later, a person, identified by Detective Lambert as defendant, exited the Taurus, walked to a silver Saturn Vue parked nearby, and obtained a sweatshirt and what appeared to be an assault rifle. The Taurus then left and returned to the gas station several times. At about 12:15 a.m., the Taurus left the gas station, driving toward the White Castle and followed by the Camry. The shooting then occurred at 12:19 a.m. After the incident, police officers discovered the Taurus near the White Castle, and found it to be registered to Anderson's mother. The police then found the Camry at Brassel's residence, and ultimately tracked and recovered it near Anderson's residence. The Vue was found at Jackson's residence and a black mask was in its trunk.

Outside the White Castle, the police recovered several 7.62 x 39, 40-caliber, and 45-caliber bullet casings, a fired bullet, and lead bullet fragments. Inside the White Castle, police recovered a 45-caliber handgun, 40-caliber handgun, 9-milimeter handgun, 40-caliber S&P, R&P, and Smith and Wesson bullet casings, 7.62 x 39 bullet casings, a 40-caliber magazine, and silver and copper bullet fragments. Additionally, a search warrant executed at Jackson's residence

recovered a 9-milimter handgun, gun holder, 45-caliber ammunition, and a 7.62 x 39 rifle round. The brands of the ammunition and rifle round from Jackson's residence matched the brands of casings recovered from the scene of the incident. In January 2019, Detroit Police Officer Kevin Butters recovered a firearm in a crate in the backyard of a house.

At trial, Michigan State Police Lieutenant Ronald Crichton testified as a qualified expert in firearm and tool mark analysis. Lieutenant Crichton examined the bullet casings, fired bullets, bullet fragments, and firearms recovered from the incident and resulting search warrant, testifying that the firearm recovered in January 2019 matched some of the 7.62 x 39 casings recovered from the scene of the incident. Lieutenant Crichton also concluded the 7.62 x 39 rifle round recovered from Jackson's residence and some of the 7.62 x 39 casings recovered from the scene of the incident were the same brand. In addition, Detroit Police Department Forensic Analyst Melanie Weathers testified as a qualified expert regarding cellular records and tele-mapping data. Weathers stated defendant's cellphone records indicated his cellphone was turned off at about 9:15 p.m. on the night of the incident. At 12:39 a.m., defendant's cellphone became active north of the White Castle. Weathers admitted there was no way to know where defendant's cellphone was between 9:15 p.m. and 12:39 a.m.

Lastly, Crystal Gray, the mother of defendant's minor son, testified that defendant came home the night of the shooting at about 12:00 a.m. Gray stated defendant sat with their son while Gray finished with a client's hair. While at the house, Gray stated defendant called her from inside the house, and defendant received telephones calls because "people thought he was involved" in the shooting. At about 12:45 a.m., defendant left the house. Beyond this information, Gray did not know how defendant got to or left the house, who dropped off or picked up defendant, or where defendant had been or was going.

*People v. Wilbourn-Little*, No. 349737, 2021 WL 5019340, at * 1–2 (Mich. Ct. App. Oct. 28, 2021) (internal footnotes omitted); *lv. den.* 509 Mich. 976, 973 N.W.2d 147 (2022).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. There was insufficient evidence to support the convictions based on insufficient identification evidence.

II. Mr. Wilbourn-Little was denied his right to effective assistance of counsel when trial counsel failed to call requested alibi witnesses, failed to call expert witnesses, and failed to effectively voir dire and cross-examine witnesses.

III. The trial court erred when it allowed the hearsay statements from the memorial service into evidence.

*See* ECF No. 1. The Court will discuss the applicable law and analysis.

**II. STANDARD OF REVIEW**

Under 28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), the following standard of review applies for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or if

the state court decides a case differently than the Supreme Court has previously done in a case

with a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

By extension, an "unreasonable application" occurs when "a state court decision unreasonably

applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. However, a

federal habeas court may not "issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly." *Id.* at 410-11.

Rather, "a state court's determination that a claim lacks merit precludes federal habeas

relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (*citing Yarborough v. Alvarado*, 541

U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state

4

prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

## II. DISCUSSION

### A. Claim # 1. The insufficiency of evidence claim.

Petitioner first argues that there was insufficient evidence presented at trial to establish his identity as one of the shooters, to support his convictions.

It well established that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *United States v. C.T.H.*, 685 F.3d 560, 562 (6th Cir. 2012) (*quoting In Re Winship,* 397 U.S. 358, 364 (1970) (internal quotations omitted)). In considering the sufficiency of the evidence, the critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (internal quotations omitted)). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*, (*quoting Jackson*, 443 U.S. at 324, 99 S.Ct. 2781).

A federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim merely because the federal court disagrees with the state court's resolution of that claim. Indeed, a court need not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Nagy*, 962 F.3d at 205. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of

the *Jackson* standard. *See Cavazos v. Smith,* 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* For a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). Indeed, a state court's determination that the evidence does not fall below that threshold is entitled to "considerable deference under [the] AEDPA." *Id.*

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F. 2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F. 3d 780, 788 (6th Cir. 2003). In evaluating a challenge to the sufficiency of the evidence to convict, the reviewing court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). The Sixth Circuit has held that "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)(internal quotation omitted); *See also Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008)("A conviction may be sustained based on nothing more than circumstantial evidence."). Moreover, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100

(2003)(quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n.17 (1957)); *See also Holland v. United States*, 348 U.S. 121, 140 (1954)(circumstantial evidence is "intrinsically no different from testimonial evidence," and "[i]f the jury is convinced beyond a reasonable doubt, we can require no more"); *Harrington,* 562 U.S. at 113 ("sufficient conventional circumstantial evidence" supported the verdict).

Under Michigan law, "the identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003) (*citing People v. Turrell*, 25 Mich. App. 646, 181 N.W.2d 655, 656 (1970)). The identity of a defendant can be inferred through circumstantial evidence. *See Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002). However, eyewitness identification is not necessary to sustain a conviction. *See United States v. Parks,* 278 F. App'x 527, 536 (6th Cir. 2008)*; Dell v. Straub,* 194 F. Supp. 2d at 648.

Petitioner's claim is without merit because the Michigan Court of Appeals has previously rejected his argument. The Court determined that:

> A rational trier of fact could find the essential elements of first-degree murder were proven beyond a reasonable doubt. Defendant does not dispute that the crime occurred. However, defendant contends there is no evidence that identifies him at the scene of the incident or identifies him as a shooter. In support of his argument, defendant points to the lack of DNA evidence and cellphone data linking him to the scene of the shooting, Jones's vague eyewitness testimony, Pittman's unreliable eyewitness testimony, and Gray's alibi testimony. Despite defendant's contentions to the contrary, viewing the evidence in a light most favorable to the prosecution, we find there is sufficient evidence to establish defendant was a shooter involved in the death of the victims to sustain defendant's first-degree murder convictions.
>
> The record has ample circumstantial evidence that defendant was a shooter involved in the incident. Shortly before the incident, the surveillance footage showed defendant, Anderson, and Jackson, in Anderson's Taurus, associating with a Camry, identified as Brassel's car, at the gas station next to the White Castle. From the surveillance footage, Detective Lambert identified defendant obtaining a dark-colored sweatshirt and assault rifle from Jackson's Vue before

7

getting back in the Taurus. Minutes before the incident occurred, the Taurus was seen driving toward the White Castle. Jones and Pittman, who were in their respective vehicles at the time of the incident, observed a taller shooter, matching defendant's physical build, with an assault rifle, wearing dark clothing and a mask. From her observations, Pittman identified defendant, Anderson, and Jackson as the shooters.

Additionally, the record shows that defendant had a preexisting relationship with the victims, involving a gang rivalry or general dislike for one another. In fact, while inside the White Castle, the victims talked about the vehicles they saw driving around the building, identifying them as "opponents or people they don't like." Moreover, Pittman's testimony revealed that Anthony was fearful of a confrontation with defendant, which was evident in his actions hours before the incident when Anthony shot at an unidentified person on a street whom he thought was defendant. While defendant contends Pittman's eyewitness testimony is unreliable because she only cooperated to avoid being charged with narcotics violations and to have impound fees waived, this argument merely is speculative and fails to identify what statements by Pittman were untruthful or to provide evidence establishing that Pittman was not testifying truthfully. Additionally, the jury evidently found Pittman credible, despite her motivation to cooperate in order to avoid narcotics violations and impound fees. Regardless, "[t]his Court must not interfere with the jury's role as the sole judge of the facts when reviewing the evidence." *People v Agar*, 314 Mich App 636, 652; 887 NW2d 662 (2016).

Moreover, defendant contends there is no cellphone data that places him at the scene of the incident. While defendant's cellphone was turned off during the duration of the incident, the cellphone records placed Anderson, Jackson, and Brassel near the scene before and during the incident. Shortly after the incident, defendant's cellphone was turned on and was located in the same area as Anderson's and Brassel's cellphones, i.e., just north of the White Castle. Because defendant was observed with Anderson and Jackson, before the incident, at the Valero gas station, there was a reasonable inference that defendant was involved in the shootings, despite defendant's cellphone being turned off.

Defendant further contends Gray's testimony established he was miles away from the scene of the incident. We acknowledge Gray's testimony that defendant was at home, from 12:00 a.m. to 12:45 a.m., at the time of the shootings. However, outside of defendant's arrival and departure, Gray admitted she had no recollection of where defendant was or went, who defendant was with, or how defendant arrived or left the house. Despite Gray's testimony, the jury evidently found the evidence linking defendant to the scene credible and Gray's testimony incredible, and "[t]his Court must not interfere with the jury's role as the sole judge of the facts when reviewing the evidence." *Agar*, 314 Mich App at 652.

*People v. Wilbourn-Little*, 2021 WL 5019340, at * 3–4.

8

In the present case, there was ample evidence for a rational trier of fact to conclude that Petitioner was one of the shooters.  He was observed on a surveillance videotape grabbing a dark-colored sweatshirt and assault rifle from Mr. Jackson's automobile and getting back into a Ford Taurus shortly before the murders at a gas station near the White Castle. Ms. Pittman and a police officer positively identified Petitioner in this videotape. A witness's positive identification of a defendant from a surveillance videotape or photograph is sufficient evidence to establish the defendant's identity as the perpetrator of the crime. *See, e.g., United States v. Ayala,* 755 F. App'x 499, 509–10 (6th Cir. 2018); *Lovely v. Jackson,* 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004).

The Taurus was seen driving toward the White Castle moments before the shooting. Jones and Pittman testified that they witnessed a taller shooter who wore dark clothing, a mask, carried an assault rifle, and matched Petitioner's physical build.  There was also evidence of prior animosity between the victims and Petitioner. Ms. Pittman testified that, earlier that evening, Mr. Anthony had feared a confrontation with Petitioner. This evidence was sufficient to establish Petitioner's identity as one of the shooters, even though the shooter was masked at the time of the shooting. *See Gov't of Virgin Islands v. Pereira*, 302 F. App'x 72 (3d Cir. 2008) (The two victims' testimony identifying defendant was sufficient to support the conviction for first–degree assault, even though the defendant was wearing a stocking mask and neither victim saw his face. One victim testified that he had been enemies with defendant since seventh grade and recognized him from his body type and braids. The victim one also testified that he had seen the defendant and his accomplice together in a car on the evening of the shooting. And victim two testified that the assailant wearing the stocking mask was the same height and weight as the defendant and had the same build, complexion, and skin color as the defendant). Petitioner's

9

prior conflict with the victims is additional circumstantial evidence that helps to establish Petitioner's identity as one of the shooters. *See e.g. Moreland v. Bradshaw*, 699 F.3d 908, 917 (6th Cir. 2012).

Although Petitioner's cellphone was off at the time of the murder, it was turned on shortly thereafter at 12:39 a.m. in the vicinity of the White Castle, where the shooting took place. Petitioner's cell phone activity near the crime scene shortly after the crime is additional circumstantial evidence that was sufficient to establish Petitioner's identity. *See e.g. United States v. Starnes*, 552 F. App'x 520, 525 (6th Cir. 2014). Although Petitioner's cellphone was turned off at the time of the shooting, this supports a finding that he intended to conceal his involvement in the shooting. *See Young v. State*, 198 N.E.3d 1172, 1178 (Ind. 2022).

In determining that sufficient evidence established Petitioner's identity as the shooter, the Michigan Court of Appeals did not unreasonably apply *Jackson v. Virginia*. *See Moreland v. Bradshaw,* 699 F. 3d at 919-21.

Petitioner also attacks the credibility of Ms. Pittman. However, his challenge to Ms. Pittman's credibility is misplaced because he improperly asks this Court to usurp's the jury's role by re-weighing the credibility of testimony and evidence. *See United States v. Campbell*, 18 F. App'x 355, 358 (6th Cir. 2001) (quoting *United States v. Tipton*, 11 F.3d 602, 609 (6th Cir. 1993)); *See also Tyler v. Mitchell,* 416 F. 3d 500, 505 (6th Cir. 2005).

Petitioner further argues that there was insufficient evidence to convict him because the police did not recover DNA evidence, fingerprints, or other forensic evidence to convict. The Sixth Circuit has held that the "lack of physical evidence does not render the evidence presented

insufficient; instead it goes to weight of the evidence, not its sufficiency." *Gipson v. Sheldon*, 659 F. App'x 871, 882 (6th Cir. 2016).

Finally, Petitioner contends that there is insufficient evidence to convict him because he presented an alibi defense at trial. A federal court reviewing a state court conviction on habeas review that is "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos,* 565 U.S. at 7 (quoting *Jackson v. Virginia,* 443 U.S. at 326). As noted, the assessment of witness credibility is beyond the purview of federal habeas review. Indeed, the jury was free to reject the alibi provided by Petitioner's girlfriend. *See Braggs v. Campbell,* 423 F. Supp. 3d 424, 431 (E.D. Mich. 2019). The evidence in this case was sufficient to challenge Petitioner's purported alibi, so the Court must presume that the jury resolved any conflict in the credibility of alibi evidence in favor of the prosecution. *See United States v. Pierce,* 62 F. 3d 818, 826 (6th Cir. 1995). The jury chose to reject the alibi defense and to accept the testimony of the prosecution's witnesses instead. Thus, Petitioner is not entitled to relief because a rational trier of fact had sufficient evidence to convict Petitioner. *Id.* After all, "[a] rational jury could have credited or discredited all or part of the testimony of the alibi witness and the mother of [Petitioner's] child, especially since it was presented with ample evidence to the contrary." *United States v. Eastman,* 645 F. App'x 476, 481 (6th Cir. 2016). Petitioner is not entitled to habeas relief on his first claim.

A. **Claim # 2. The ineffective assistance of counsel claim.**

Next, Petitioner avers that he was denied the effective assistance of trial counsel. To prevail on his ineffective assistance of counsel claims, Petitioner must show that the state court's conclusion regarding these claims was contrary to, or an unreasonable application of, *Strickland*

*v. Washington*, 466 U.S. 668 (1984). *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). *Strickland* established a two-prong test for claims of ineffective assistance of counsel: the petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687.

Petitioner contends that trial counsel was ineffective because he failed to call additional alibi witnesses to buttress the testimony of Ms. Gray, the one alibi witness who testified. Petitioner is not entitled to relief on his claim because he failed to provide either this Court or the Michigan courts affidavits from these alleged alibi witnesses concerning their proposed testimony and willingness to testify on Petitioner's behalf.  Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief. *See Workman v. Bell,* 178 F.3d 759, 771 (6th Cir. 1998). Petitioner offered no evidence beyond his own assertions as to whether these witnesses would have testified and what the content of their testimony would have been.  In the absence of such proof, Petitioner is unable to establish that he was prejudiced by counsel's failure to call alibi witnesses to testify at trial, so his argument fails on the second prong of the ineffective assistance of counsel test. *See Clark v. Waller,* 490 F.3d 551, 557 (6th Cir. 2007).

Petitioner also claims that trial counsel should have called expert witnesses to rebut the prosecutor's cellular data and firearms experts.  A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be speculative. *See Keith v. Mitchell,* 455 F.3d 662, 672 (6th Cir. 2006).  As with his proposed alibi witnesses, Petitioner has offered no evidence that he had an expert witness who would testify and what the content of this witness' testimony would have been.  In the absence of such proof, Petitioner is unable to establish that he

12

was prejudiced by counsel's failure to call an expert witness. In this way, Petitioner fails on the second prong of his ineffective assistance of counsel claim. *See Clark v. Waller,* 490 F.3d at 557.

Moreover, the Michigan Court of Appeals concluded that trial counsel was not ineffective for failing to call rebuttal expert witnesses because neither of the prosecution experts' testimony was particularly harmful to Petitioner:

> Even to the extent trial counsel should have called a rebuttal forensic analyst or firearms expert, the outcome of the proceedings would not have been different. During cross-examination, Weathers admitted there was no way of knowing where defendant's cellphone was located between 9:15 p.m. and 12:39 a.m., the night of the incident, because it was turned off. Instead, Weathers's testimony primarily analyzed the location of Jackson's, Anderson's, and Brassel's locations, and the prosecution attempted to create an inference that defendant was with them. Because defendant's cellphone was turned off and provided no location information during the incident, we are skeptical about what testimony a rebuttal expert could offer regarding his cellphone data. Similarly, while trial counsel did not cross-examine Lieutenant Crichton, his testimony was not particularly damaging to defendant because the firearm he identified, using the 7.62 x 39 rifle rounds during the incident, was recovered in a location unrelated to defendant. In fact, Lieutenant Crichton did not testify regarding any evidence that directly linked defendant to the incident.
>
> Because there was no firearm evidence recovered from defendant's possession or containing defendant's DNA, we are similarly skeptical about what testimony a rebuttal expert could offer for the defense. Rather, it appears the jury relied more heavily on the eyewitness testimony, video surveillance footage, cellphone data, and conduct by the victims. Accordingly, defendant's claim of ineffective assistance of counsel for a failure to call rebuttal expert witnesses is without merit.

*People v. Wilbourn-Little*, 2021 WL 5019340, at * 6.

In light of the fact that the testimony of the prosecution experts was rather unremarkable and not critical to the case against Petitioner, the Court finds that counsel was not ineffective for failing to call defense expert witnesses to rebut the prosecution's expert testimony. *See Spaulding v. Larson,* 704 F. App'x 475, 481 (6th Cir. 2017).

Next, Petitioner contends that trial counsel was ineffective for failing to adequately cross-

examine and impeach the prosecution's witnesses.  The Michigan Court of Appeals rejected this

claim as well:

> Defendant next argues that trial counsel failed to effectively cross-examine eyewitness testimony. However, this Court "will not second-guess counsel on matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Defendant contends Pittman and Jones were not effectively questioned about consuming alcohol before the incident, Pittman's overall memory of the incident, or Jones's pending criminal charges. A review of the record indicates that trial counsel obtained cross-examination testimony from Jones that he, Pittman, and the victims had been consuming alcohol before the incident. Trial counsel cross-examined Pittman regarding her cooperation in testifying to avoid narcotics violations and to have impound fees waived. While there was no cross-examination relating to Pittman's testimony that she was "dozing off" in her vehicle shortly before the incident occurred, trial counsel did object to Pittman's testimony regarding Anthony's shooting at a person on the street hours before the White Castle shooting. However, the trial court overruled this objection.
>
> We note that trial counsel did not specifically question Pittman regarding her alcohol consumption before the incident or Jones regarding his pending criminal history. To the extent trial counsel failed to thoroughly cross-examine Pittman and Jones, defendant has not established the outcome of the proceedings would have been different if trial counsel had done so. The eyewitness testimony, on its own, did not offer significant damaging testimony because neither eyewitness could explicitly identify defendant as a shooter. Rather, Pittman's and Jones's testimony was supported by other evidence, including the video surveillance footage, cellphone data, and evidence recovered from the scene and search warrants, which the jury could evaluate for themselves. In fact, it appears trial counsel's decision to not painstakingly question the eyewitnesses prevented additional testimony coming out at trial regarding defendant's motive and history with the victims. Specifically, Pittman testified, in October 2018 during an investigative subpoena under MCL 767(a)(1), that Anthony was found not guilty of shooting a person who was the sister of one of defendant's friends, which prompted a separate "shootout" between defendant and Anthony in August 2018. Pittman also testified that she "for sure knew the [person] with the AK-47 was [defendant]" because of the recent interaction with Anthony. In light of this, trial counsel's trial strategy of limiting cross-examination to testimony that supported the theory that defendant was not involved in the incident was reasonable.

*People v. Wilbourn-Little*, 2021 WL 5019340, at * 6–7.

14

Impeachment strategy falls within the category of an attorney's "tactical decisions [that] are difficult to attack." *See Tackett v. Trierweiler*, 956 F.3d 358, 374 (6th Cir. 2020). Indeed, a defendant "attacking his lawyer's performance must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994) (*quoting Strickland*, 466 U.S. at 689, 104 S.Ct. 2052) (internal quotation marks omitted).

Petitioner's claim fails for several reasons. First, neither Ms. Pittman nor Mr. Jones were able to identify Petitioner as being one of the shooters. Given that neither eyewitness positively identified Petitioner as being one of the shooters, their testimony was not particularly damaging. Additionally, counsel may very well have made a strategic decision to avoid further questioning either Ms. Pittman, or Mr. Jones, to avoid eliciting evidence of the prior dispute between Petitioner and the victims, which would have established a motive for the murders. Hence, counsel's failure to further cross-examine them might be considered a sound trial strategy to avoid eliciting testimony from the witnesses which would have been damaging to Petitioner's theory of case. *See Smith v. Woods*, 505 F. App'x 560 (6th Cir. 2012).

"Although other attorneys might have reached a different conclusion about the value of cross-examining [Ms. Pittman and Mr. Jones] in greater detail, counsel's strategic choice not to further cross-examine the witnesses was "'within the wide range of reasonable professional assistance.'" *See Moss v. Hofbauer,* 286 F.3d 851, 864 (6th Cir. 2002)(quoting *Strickland*, 466 U.S. at 689). Finally, Petitioner has failed to identify how additional impeachment of the victim would have affected the jury's decision. Defense counsel did not perform ineffectively by not more forcefully cross-examining the victim, particularly when the potential effect of further

probing was entirely speculative on petitioner's part. *See Jackson v. Bradshaw,* 681 F.3d 753, 764-65 (6th Cir. 2012).  Petitioner is not entitled to relief on his second claim.

**B.  Claim # 3. The evidentiary issue.**

Petitioner next argues the trial judge erred in admitting into evidence a statement from Mr. Anthony, one of the murder victims. Before the White Castle shooting and his subsequent death, Mr. Anthony told Ms. Pittman that he saw Petitioner on the street and fired his gun at Petitioner.  Petitioner claims that this statement was inadmissible hearsay. However, the Sixth Circuit has determined that "[a]lleged trial court errors concerning the application of state evidentiary law . . . are not cognizable as grounds for habeas relief." *See Byrd v. Tessmer,* 82 F. App'x 147, 150 (6th Cir. 2003). The Michigan Court of Appeals determined that Mr. Anthony's statement to Ms. Pittman was admissible either under the present sense or excited utterances exceptions to the hearsay rule. *People v. Wilbourn-Little*, 2021 WL 5019340, at * 7 and n. 5. Petitioner's claim that the trial court improperly admitted Mr. Anthony's out-of-court statement to Ms. Pittman pursuant to the present sense impression exception to the hearsay rule is non-cognizable in federal habeas review. *See Wheeler v. Jones,* 59 F. App'x 23, 28 (6th Cir. 2003). Petitioner's claim that the trial court improperly admitted the statement to Ms. Pittman under the excited utterance exception to the hearsay rule likewise presents a state evidentiary law issue which is not cognizable on federal habeas review. *See e.g. Smith v. Jones,* 326 F. App'x 324, 330 (6th Cir. 2009).

Finally, the admission of Mr. Anthony's out-of-court statement to Ms. Pittman did not violate Petitioner's Sixth Amendment right to confrontation. Out of court statements that are testimonial in nature are preclude from admission into evidecne by the Sixth Amendment Confrontation Clause, unless the witness is unavailable and the defendant has had a prior

16

opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36 (2004). However, the Confrontation Clause is not implicated, and thus does not need to be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U. S. 813, 823-26 (2006); *See also Desai v. Booker,* 538 F.3d 424, 425-26 (6th Cir. 2008). Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Crawford,* 541 U.S. at 51-52, 56. In holding that the Sixth Amendment right to confrontation does not apply to non-testimonial statements, the Supreme Court stated:

> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

*Davis,* 547 U.S. at 823-24 (*quoting Crawford,* 541 U.S., at 51).

Mr. Anthony's statement to Ms. Pittman did not qualify as testimonial statements covered by the Confrontation Clause because it was a remark made to a friend or acquaintance and not one made to law enforcement. *See Deshai,* 538 F. 3d at 427. Petitioner is not entitled to relief on his third claim.

## IV. CONCLUSION

The Court will deny the petition for a writ of habeas corpus. The Court will also deny a certificate of appealability. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate

whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny Petitioner a certificate of appealability because reasonable jurists would not find this Court's assessment of Petitioner's claims to be debatable or wrong. *See Dell v. Straub,* 194 F. Supp. 2d at 659. However, although reasonable jurists would not debate this Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on appeal. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).

## V. ORDER

Based upon the foregoing, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED.**

**IT IS FURTHER ORDERED** that leave to appeal *in forma pauperis* is **GRANTED**.


Dated:  August 22, 2024                          /s/Gershwin A. Drain

                                                 GERSHWIN A. DRAIN

                                                 United States District Judge

18

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 22, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Deputy Clerk